*In re* MARRIAGE OF DAWN S. HOENER STANLEY, Petitioner-Appellee, and STEVE K. HOENER, Respondent-Appellant.

Fourth District   No. 4—84—0497

Opinion filed June 13, 1985.—Rehearing denied July 16, 1985.

964

Gerald L. Timmerwilke, of Lewis, Blickhan, Longlett & Timmerwilke, of Quincy, for appellant.

F. Donald Heck, Jr., of Pollock, Ennis & Heck, of Quincy, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

The respondent, Steve K. Hoener (Steve), appeals various aspects of an order concerning maintenance, child support, attorney fees, and owelty entered subsequent to an order dissolving his marriage to the petitioner, Dawn S. Hoener (Dawn).

Following the dissolution of the parties' marriage on June 4, 1981, the court entered a series of orders pertaining to property disposition, child support and custody, and maintenance, as well as attorney fees,

marital debts and owelty.

In order to place this case in proper perspective, it is necessary to view in part the actions and orders of the trial court in a somewhat reverse order. This will better dispose of some of the issues and will also tend to moot some of these same issues raised on appeal.

The order, June 14, 1984, appealed from was entered by the trial judge on the defendant's motion for reconsideration and on all other pleadings filed by the parties from the date of the order of October 21, 1983, to the May 16, 1984, hearing date. The trial court took the matter of all motions under advisement on May 16, 1984, and entered the order on June 14, 1984.

Certainly, in a hearing of reconsideration, the court has the opportunity to hear additional evidence which will either further justify the original order or be reason for change. If the court requires additional matters to be brought or pleadings filed during the process of reconsideration, it is appropriate.

On February 15, 1984, the trial court at a hearing on Steve's motion for reconsideration ordered the parties to submit current family budgets, Steve was granted leave to file a petition to modify based upon remarriage of Dawn, Dawn was granted leave to file a petition for increase of child support, and Steve was granted leave to file an affidavit concerning his payments of alimony, child support, maintenance, and owelty (an outdated term not now used, denoting a property division equalization payment. See Black's Law Dictionary 996 (5th ed. 1979)). Pursuant to this order, Dawn, on March 14, 1984, filed a petition to increase child support and her family budget, and Steve filed his petition to decrease child support and maintenance based upon the remarriage of Dawn and his family budget. On April 5, 1984, Steve filed an affidavit as to payments of child support, maintenance, and owelty.

In the order filed October 21, 1983, the court found that Dawn was, at that time, cohabiting with another and on that basis terminated Steve's obligation to provide Dawn with maintenance, with effect from the date of the order. The court further found, however, that the elimination of his maintenance obligation increased Steve's ability to provide child support and on that basis increased his child support obligation to $260 per month. Additionally, Dawn was awarded possession of the marital residence as child support until the children's emancipation.

After noting that it had, in its December 23, 1982, order, reserved the question of attorney fees, and that Dawn sought attorney fees "in connection with the present proceedings," the court awarded Dawn

the amount of $750 "against any and all attorney's fees incurred by [Dawn] in this proceeding to date." Furthermore, the court ordered Steve to execute in Dawn's favor a note and mortgage on the marital residence in the amount of owelty, child support, and maintenance arrearages. If Steve did not pay Dawn the $750 for attorney fees within 30 days of the order, that amount was to be added to the amount of the note and mortgage. Finally, noting that Steve had not seen his children for many months, the court modified a prior order by limiting Steve's visitation to each Wednesday from the end of the school day until 8 p.m. and every other Saturday evening from 4 to 8 p.m. Upon Steve's exercising visitation on this schedule for four consecutive weeks, visitation on every other weekend was to be expanded to extend from 10 a.m. Saturday to 8 p.m. Sunday.

It is clear from reading the record in this case that the trial judge did yeoman's work in attempting to resolve all of the problems between the parties.

The defendant asserts eight issues on appeal: (1) Whether the trial court erred in modifying the respondent's child support obligation without a petition's having been filed; (2) whether the trial court erred in modifying the respondent's visitation rights without a petition's having been filed; (3) whether the trial court erred in allowing the petitioner to maintain possession of the marital residence despite her cohabitation and subsequent remarriage, thereby divesting the respondent of a vested property right contrary to the law of the State of Illinois; (4) whether the trial court erred in awarding $750 in attorney fees to the petitioner in light of the relative financial resources of the parties; (5) whether the trial court erred in awarding $750 in attorney fees to the petitioner when such attorney fees were precipitated by the petitioner's cohabitation with another person on a resident, continuing conjugal basis; (6) whether the trial court erred in not terminating maintenance retroactively to the time of the filing of the petition for modification; (7) whether the trial court erred in the determination and setting of owelty, child support, and maintenance arrearages; and (8) whether the trial court erred in ordering the respondent to execute a note and mortgage on the marital residence in favor of the petitioner as security for the payment of attorney fees and arrearages in owelty, child support, and maintenance.

Steve's first allegations of error are that when it entered its October 23, 1983, order, the trial court improperly increased his child support obligation and altered his visitation rights, because, at the time of the order, there were no petitions on file requesting such relief. The events which resulted in the October 23, 1983, order began with

Steve's filing a petition on February 4, 1983, requesting termination of his maintenance obligation, a change in the children's custody to himself, sale of the marital residence, and possession of the residence until its sale. This petition further requested that "all ancillary matters concerning support, health needs and other matters relating to the children be so modified as the court deems appropriate and just." The basis for these requests was Dawn's alleged cohabitation with another on a resident, continuing conjugal basis, which created an environment that Steve alleged seriously endangered the children's moral well-being. On the same date, Steve filed a petition stating that Dawn had intentionally interfered with his visitation rights and had refused to allow him to visit his children. This petition requested that Dawn be found in contempt, that she be ordered not to interfere with and to cooperate with all future visitation by Steve, that Steve be awarded reasonable attorney fees with respect to the petition, and that he "have such other and further relief as the court deems appropriate and just."

At the hearing on September 8, 1983, the following dialogue occurred:

> "MR. TIMMERWILKE [Steve's attorney]: We have a show cause on the visitation, and I believe that that will also be covered today; that there has been intentional frustration on the part of Mrs. Hoener to allow visitation with the children for Mr. Hoener.
>
> THE COURT: Is that correct, Mr. Schuering, those are the only issues?
>
> MR. SCHUERING [Dawn's attorney]: Yes, your Honor, and our petition that we have filed to show cause on the support.
>
> THE COURT: On the arrearages?
>
> MR. SCHUERING: I think the whole thing. I think the question of support and maintenance are also set, you know, for review. We are requesting that support, in fact, be increased pursuant to the last petition that we filed that is set for review, so I think the Court basically is considering the entire matter on support, maintenance, visitation, change of custody, the whole ball of wax."

(The record does not reflect the filing by Dawn of any petition for increased child support subsequent to the December 23, 1982, order other than the March 14, 1984, petition.) The hearing was subsequently continued to September 12, 1983, and the October 21, 1983, order followed.

■ While it is elemental that a judgment of dissolution of mar-

riage may be modified only pursuant to a petition (Ill. Rev. Stat. 1983, ch. 40, par. 511), the filing of Dawn's petition for increased child support on March 14, 1984, belies Steve's contention that no such petition was on file when his support obligation was increased. Following the filing of this petition, the court reviewed its October 21, 1983, order modifying child support and reaffirmed that order after considering affidavits regarding the financial status of the parties and arguments of counsel as to the proper amount of child support. Also, at the outset of the May 16, 1984, hearing, the court intimated that it would have been willing to allow the parties to present evidence at the hearing if they had so desired. In sum, at the proceedings following the filing of Steve's motion to reconsider the court's order of October 21, 1983, Steve had the same opportunity to litigate the issue of child support, and the issue was litigated to the same extent as would have been the case in proceedings on an original motion to modify the child support provisions of the orders entered prior to October 21, 1983.

■ Steve does not now contend that the amount of increased child support awarded is excessive. Instead, in effect he maintains that we should reverse the award of increased child support merely because the parties may have applied the wrong label to the proceedings which resulted in the final determination that child support should be increased, and because those proceedings resulted in the same order increasing child support as did prior proceedings which were not initiated by means of a petition to increase support. We decline to reverse an award of increased child support, the request for which was fully litigated below, on the basis of trivialities such as these. It is clear from a review of the pleadings, the evidence presented, and the orders of the trial court that the issue of child support was properly before the court with respect to the reconsideration order of June 14, 1984. The issue of a proper petition as to child support being filed is thus moot.

■ As for the court's allegedly modifying Steve's visitation privileges without a petition for such modification having been filed, we note that the Illinois Marriage and Dissolution of Marriage Act (IMDMA) creates, in the case of child visitation rights, an exception to the general requirement that modification of a dissolution of marriage decree be preceded by a petition requesting modification, by providing that visitation rights may be modified "whenever modification would serve the best interest of the child." (Ill. Rev. Stat. 1983, ch. 40, par. 607(c).) Moreover, even before promulgation of the Uniform Marriage and Divorce Act (9A Uniform Laws Annotated 96 through 221

(1979)), the general rule was that once the issue of custody or visitation is placed before the court, the court may alter custody or visitation rights to the extent required by the children's best interest, even if no petition requesting the relief awarded is on file. (See *Gianformaggio v. Gianformaggio* (Mo. App. 1960), 341 S.W.2d 293; S____ v. G____ (Mo. App. 1957), 298 S.W.2d 67.) The rationale for this rule is aptly stated in S____.

> "A child is not a horse or dog to be won or lost depending upon the wish or whim of some person to be stated, or not stated, in a pleading. In *** a [child custody] proceeding four persons are involved, the two adversaries, the child (who stands to win or lose the most) and to some extent the public. Once the issue of the welfare of the child has been submitted to the court, that court must of necessity make such orders as are proper to accomplish such welfare, and technical objections in respect to pleadings on a motion to modify should not prevent a decision on the merits." 298 S.W.2d 67, 74.

In the present case, the matter of visitation was placed in issue by Steve's filing the February 14, 1983, petition requesting, *inter alia*, that because of Dawn's cohabiting with another on a resident, continuing conjugal basis, custody be changed to him, as well as Steve's petition of the same date that Dawn be held in contempt for failure to accord him visitation. Also, at the May 16, 1984, hearing, Steve was afforded an opportunity to present evidence as well as arguments as to this issue. Under these circumstances, the trial court did not err in altering Steve's visitation privileges.

■ Steve next contends that the circuit court erred in refusing to terminate Dawn's right to occupy the marital residence as of October 6, 1983, the date that she married Ronald Stanley, and instead awarding her possession of the home, as child support, until the children's emancipation. The basis for this assertion is the provision in the property disposition order of October 9, 1981, that Dawn's right to occupy the residence is to cease upon her remarriage. With respect to Dawn's possession of the marital home, the original decree provided a $25/60$ portion of the value of the use of the residence was to be allocable to maintenance and a $35/60$ portion to child support. (Contrary to Steve's contention, there is no statement by the trial court in the common law record that Dawn's right to occupy the residence also is to cease upon her cohabiting with another on a resident, continuing conjugal basis.) Steve maintains that the court's refusal to terminate Dawn's right to occupy the marital residence as of the date that she married Stanley altered the court's prior disposition of the parties'

property and thereby deprived him of a vested property right in violation of paragraph (a) of section 510 of the IMDMA (Ill. Rev. Stat. 1983, ch. 40, par. 510(a)).

Section 510 of the IMDMA provides in part:

> "(a) *** The provisions [of a dissolution of marriage decree] as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State." (Ill. Rev. Stat. 1983, ch. 40, par. 510(a).)

Maintenance or child support provisions may, however, be modified upon a showing of "a substantial change in circumstances." Ill. Rev. Stat. 1983, ch. 40, par. 510(a).

*Lamp v. Lamp* (1980), 81 Ill. 2d 364, 410 N.E.2d 31, involved a situation substantially similar to that present here. In *Lamp*, the defendant was awarded custody of the parties' children and possession of the marital home until she remarried or until the youngest child reached age 18, whichever occurred first. Subsequently, the defendant consented to a change of the children's custody to the plaintiff. Still later, the plaintiff filed a petition for modification, alleging that the parties' use of the home as a residence was no longer necessary, since the children were residing with the plaintiff, and requesting that the property be sold without waiting for the occurrence of one of the events which the initial decree provided would result in termination of the defendant's right of occupancy. The trial court entered an order so providing.

The supreme court, in rejecting the defendant's contention that the trial court's order deprived her of a vested property right, held that the award of temporary possession of the home to the defendant "stands on the same basis as [a] provision for monetary [child] support." (81 Ill. 2d 364, 371-72, 410 N.E.2d 31, 34.) In arriving at this conclusion, the court noted that the mortgage installments and real estate taxes were to be paid by the plaintiff; that use of the home was rent-free to the defendant; that had it been necessary for the defendant to find other quarters, a larger support payment would probably have been awarded; and that the outside limit on the defendant's right to possession of the residence was the date that the children would attain majority, which in turn was the same date the plaintiff's child support obligations would normally have ended. Thus the award of use of the residence to the defendant was modifiable upon a showing of changed circumstances, and the transfer of the children's custody to plaintiff resulted in changed circumstances justifying termination of the defendant's right of occupancy.

In the present case, the record likewise demonstrates that the award to Dawn of use of the marital residence was not a part of the court's property disposition. The trial court's explicit statement that $25/60$ of the value of the home's use was allocable to maintenance and $35/60$ allocable to child support makes it apparent that use of the home was instead intended to be in the nature of an award of additional maintenance and child support to Dawn. The provision for forfeiture of Dawn's right to use the residence upon her remarriage buttresses this conclusion. Also, in the present case, as in *Lamp* (but unlike in the two cases on which Steve relied, *In re Marriage of Christianson* (1980), 89 Ill. App. 3d 167, 411 N.E.2d 519 and *Chamberlin v. Chamberlin* (1969), 119 Ill. App. 2d 295, 256 N.E.2d 159), there is no evidence that Dawn gave up some property interest of her own as a *quid pro quo* for her right to possession of the marital residence. The fact that Dawn is responsible for mortgage payments does not, in our view, sufficiently distinguish this case from *Lamp* to make that holding inapplicable, in view of the improbability of Dawn's being able to secure housing of equivalent quality for herself and her children for the amount of the monthly mortgage payment ($284.88).

Because Dawn's right to occupy the marital home constituted nonmonetary maintenance and child support, the duration of her occupancy was modifiable upon a showing of substantially changed circumstances. Steve makes no contention that the circumstances of the parties had not substantially changed at the time of the October 21, 1983, order. We therefore hold that the trial court did not err in modifying the prior orders by awarding Dawn use of the marital home as child support until the children's emancipation.

■ Steve further contends that in its October 21, 1983, order, the circuit court erred in ordering him to pay the amount of $750 toward Dawn's attorney fees. The relevant portion of the October 21, 1983, order provides:

"The question of attorney's fees was reserved in the 12-23-82 order, in which the court ordered the payment of back child support. The wife seeks attorney's fees in connection with the present proceedings. It is ordered that the husband pay the amount of $750 against any and all attorney's fees incurred by the wife in this proceeding to date."

The order contains no explicit statement as to whether the $750 was included in, or is in addition to, the $812.34 of Dawn's attorney fees which Steve was to pay by virtue of an order dated July 29, 1981. Steve does not, however, question the manner in which the court arrived at the $750 figure; instead, he contends the evidence does not

demonstrate that he, rather than Dawn, possesses a greater ability to pay Dawn's attorney fees; that there was no finding that he was in contempt at the time of the October 21, 1983, order which would have required a mandatory fee award; and that the trial court did not suggest that it was awarding fees based on a previous contempt finding.

Generally, a party seeking a fee award with respect to a dissolution of marriage proceeding must establish that he or she does not have the ability to pay all or part of his or her attorney fees and that the opposing party has that ability. (*In re Marriage of Hopkins* (1982), 106 Ill. App. 3d 135, 435 N.E.2d 897.) However, where the fees sought relate to successful enforcement of a child support award by the custodial parent, and the failure to pay support was without cause or justification, an award of fees against *the person who owed the past-due support* is mandatory. (Ill. Rev. Stat. 1983, ch. 40, par. 508(b); *Fogliano v. Fogliano* (1983), 113 Ill. App. 3d 1018, 448 N.E.2d 245.) The amount of time spent on the case by lawyers, the ability of the lawyers involved, and the complexity of the legal work must, of course, form the foundation for any fee award. *Quinsippi Corp. v. Bening* (1982), 105 Ill. App. 3d 241, 433 N.E.2d 1368.

■ At the time of the October 21, 1983, order the circuit court had authority to award attorney fees on the basis of the December 23, 1982, contempt finding. The key prerequisite to any contempt finding is the wilfulness of the contemptuous conduct (*People v. Mowery* (1983), 116 Ill. App. 3d 695, 452 N.E.2d 363), and wilfulness, used in this context, connotes conduct without cause or justification. (See Black's Law Dictionary 1434 (5th ed. 1979).) It follows that the December 23, 1982, order finding Steve in contempt carried with it an implicit finding that Steve's failure to make the child support payments was without cause or justification. The order thus provided the basis for a mandatory award of the amount of attorney fees which Dawn incurred in obtaining it.

Furthermore, the general rule in divorce proceedings prior to the adoption of the IMDMA was that a court, by reserving jurisdiction to decide the question of attorney fees, could award fees at a time subsequent to the proceeding to which the fee award related. (*Bremer v. Bremer* (1954), 4 Ill. 2d 190, 122 N.E.2d 794; *Hokin v. Hokin* (1968), 102 Ill. App. 2d 205, 243 N.E.2d 579.) There is nothing in the IMDMA which provides a basis for holding that this practice is no longer permissible. Therefore, the reservation of the question of attorney fees at the time of the December 23, 1982, order provided the court with authority to include in its October 21, 1983, order an award of the fees which Dawn reasonably incurred in obtaining the December 23, 1982,

order.

■ With respect to an award of attorney fees relating to proceedings other than those which resulted in the December 23, 1982, order, we agree, however, with Steve's contention that there was no basis for such an award. The most recently filed documents relevant to the parties' income and expenses reveal that Dawn and her new husband, with whom the parties' two children reside, have a monthly deficit of $774.51, while Steve has a monthly deficit of $453.76. This evidence, while demonstrating that Dawn may not be able to pay the fees, does not establish that Steve is able to do so. Therefore, an award of fees to Dawn for legal services other than those relating to the proceedings which resulted in the December 23, 1982, order would have been erroneous. See generally *In re Marriage of Miller* (1980), 84 Ill. App. 3d 931, 405 N.E.2d 1099.

The trial court's October 21, 1983, order does not clearly state what portion of the $750 fee award is applicable to services rendered in connection with Dawn's obtaining the December 23, 1982, order finding Steve in contempt, and what portion, if any, is allocable to services other than those which resulted in Dawn's obtaining that order. Since it is thus possible that a portion of the $750 fee award may represent compensation for services unrelated to the contempt order, we must vacate this award and remand the cause to the circuit court with directions that the court enter a new fee award consisting solely of those fees which Dawn necessarily incurred in obtaining the December 23, 1982, order finding Steve in contempt.

Although neither party raises the issue on appeal, we note parenthetically that a fee award in a dissolution of marriage case must be supported by evidence of the skill and standing of the attorneys employed, the novelty and difficulty of the questions at issue, the amount and importance of the subject matter, especially from a family law standpoint, the degree of responsibility involved in the management of the case, the amount of time and labor involved in the representation of the client, the usual and customary charge for the services in the community, and the benefits accruing to the client. (*In re Marriage of Jacobson* (1980), 89 Ill. App. 3d 273, 411 N.E.2d 947.) At the September 8, 1983, hearing, a bill for services rendered with regard to the proceedings resulting in the December 23, 1982, order was introduced into evidence, but this bill is not a part of the record on appeal. At the proceedings on remand, the amount of fees claimed to be allocable to the proceedings which resulted in the December 23, 1982, contempt order should be supported by evidence which establishes the reasonableness of the amount in accordance with the *Jacobson* factors.

(Because of our resolution of this issue, we need not consider Steve's contention that an award to Dawn of attorney fees for services rendered with regard to proceedings subsequent to the December 23, 1982, order would have been improper because those proceedings were precipitated by Dawn's cohabiting with Stanley.)

■ Steve also asserts that his obligation to provide Dawn with maintenance should have been terminated retroactively to February 14, 1983, the date that he filed the petition requesting termination of his maintenance obligation. The relevant portions of the IMDMA provide:

> "(a) Except as otherwise provided in paragraph (f) of Section 502, the provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to the filing of the motion for modification with due notice by the moving party and only upon a showing of a substantial change in circumstances. The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State.
>
> (b) Unless otherwise agreed by the parties in a written separation agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance *is terminated* upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 40, pars. 510(a), 510(b).

The circuit court, in its October 21, 1983, order refused to terminate Steve's maintenance obligation retroactively to the date that he filed his petition for termination, holding that "it cannot be apparent that there is a resident, continuing conjugal relationship until the court says so."

Subsection 510(a) certainly provides authority for the court to make effective the petition to modify on or after the filing date, *i.e.*, February 14, 1983, as the subsection authorizes modification of installments which accrue subsequent to the filing of the petition for modification. (*Green v. Green* (1974), 21 Ill. App. 3d 396, 315 N.E.2d 324; *In re Marriage of Junge* (1979), 73 Ill. App. 3d 767, 392 N.E.2d 313.) The question is whether the termination of maintenance on the basis of the payee's cohabitation with another on a resident, continuing conjugal basis became effective when the petition for termination was filed or when the court made its findings and order that there was cohabita-

tion.

Counsel have cited no cases, and our research has disclosed none, which interpret section 510 of the IMDMA (Ill. Rev. Stat. 1983, ch. 40, par. 510) in the context of the question of exactly when the obligation to pay maintenance terminates in cases where the payee cohabits with another on a resident, continuing conjugal basis. However, the practice under the former Divorce Act (Ill. Rev. Stat. 1975, ch. 40, pars. 1 through 32) with regard to termination of alimony in the event of remarriage of the party to whom alimony was being paid provides us with some guidance in this matter.

The doctrine that remarriage of the payee spouse terminated the supporting spouse's obligation to provide alimony originated as a common law doctrine (*Stillman v. Stillman* (1881), 99 Ill. 196) and was later codified at section 18 of the Divorce Act. (Ill. Rev. Stat. 1975, ch. 40, par. 19.) The *Stillman* court held that it was not error for the chancellor to refuse to make the termination of alimony as a result of the remarriage of the payee retroactive to a date prior to the entry of the decree permitting termination. Later cases, decided under both the common law and statutory formulations of this doctrine held, however, that alimony was terminable as of either the date of the payee's remarriage (*Banck v. Banck* (1944), 322 Ill. App. 369, 54 N.E.2d 577 (statute); *Morgan v. Lowman* (1899), 80 Ill. App. 557 (common law) or the date of the filing of the petition for termination (*Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504 (statute)), despite the general rule that past-due alimony payments are vested rights which may not be modified. (*E.g. Craig v. Craig* (1896), 163 Ill. 176, 45 N.E. 153; *Bush v. Bush* (1942), 316 Ill. App. 295, 44 N.E.2d 767.) The import of the above authorities is that under statutes providing for termination of alimony or maintenance payments upon the payee's assuming a changed status, the obligation to provide the payments terminates, at the latest, on the date that the petition for termination is filed.

An individual's commencing cohabitation with another on a resident, continuing conjugal basis represents a change in the status of that individual to the same extent as would marriage to the person with whom the cohabitation takes place. (See *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 388 N.E.2d 1131.) It follows that when a party to a dissolution of marriage action cohabits with another on a resident, continuing conjugal basis, maintenance payments to that party are terminable as of the date that the petition for termination is filed, provided, of course, that the allegations of the petition are sustained by proof of facts in existence as of the date of the petition's filing.

■ In its order of October 21, 1983, the circuit court found, *inter alia*, that (1) Stanley resided with Dawn, in her residence, "mostly on weekends, from October 1982 through May or June 1983, with the exception of one month when the two apparently were not getting along"; (2) Stanley resided at Dawn's home "every night during a two and one-half week period in late January 1983," (3) one of the reasons for Stanley's moving out at the end of the 2½-week period was Dawn's attorney's advice that he do so; and (4) it appeared that Dawn intended to cohabit with Stanley for the foreseeable future, "the primary reason (perhaps the only reason) for terminating [apparently near the end of January 1983] the co-habitation [being] the motion *** [to terminate maintenance]." We deem these findings to be adequately supported by the evidence, and Dawn does not assert that they are insufficient to support the legal conclusion that she and Stanley began a course of resident, continuing conjugal cohabitation prior to February 14, 1983, the date that Steve filed the petition for termination of his maintenance obligation.

In view of the supreme court's recent holding in *In re Marriage of Sappington* (1985), 106 Ill. 2d 456, that proof of sexual intercourse is not necessary to establish a conjugal relationship, we hold that the above-mentioned findings sufficiently establish that resident, continuing conjugal cohabitation between Dawn and Ronald Stanley began prior to the date that Steve filed the petition for termination of his maintenance obligation. We, therefore, reverse the portion of the circuit court's order holding that Steve is liable to Dawn for maintenance payments accrued subsequent to February 14, 1984.

Dawn contends that a holding that termination of maintenance because of cohabitation on a resident, continuing conjugal basis becomes effective on the date that a petition seeking termination is filed would require the trial court to "determine the exact time when a party's cohabitation becomes a continuing conjugal one," and that making this determination "would impose quite a hardship." Dawn also asserts that, under the circumstances here present, refusal to make termination of maintenance retroactive to the date of the petition for termination discourages parties from unilaterally terminating maintenance in the hope that a court will ultimately rule in their favor.

■ As for Dawn's first contention, a petition requesting a legal remedy may not properly be filed unless facts exist on the date of its filing which entitle the petitioner to the relief sought. (See 71 C.J.S. *Pleading* sec. 543, at 1108 (1951) (proof that cause of action stated in pleading arose after date pleading was filed is fatal to right to recover thereon).) In order to adjudicate a petition for termination of mainte-

nance, some finding as to the existence or nonexistence of facts justifying termination must inevitably be made, and if facts justifying termination are found to exist, those facts must have existed as of the date of the petition's filing in order for termination to be permitted on the basis of the petition. Thus, termination as of the date of the petition's filing imposes no greater a hardship on the circuit court than do any of the myriad of other factual determinations which the court must daily make.

■■■ As for Dawn's second contention, it is undoubtedly true that in at least a few cases, the policy of terminating maintenance payments retroactively to the date that the petition for termination is filed will have the effect of encouraging unilateral termination of maintenance payments when there is no legal basis for termination. The applicable statute provides, however, that the right to maintenance "is terminated" in the event of the recipient spouse's remarrying or cohabiting with another on a resident, continuing conjugal basis. (Ill. Rev. Stat. 1983, ch. 40, par. 510(b)). The legislature has thus judged that the desirability of permitting termination of maintenance immediately upon the happening of one of the specified events outweighs the potential adverse consequences of such a policy. We are not at liberty to disturb that judgment. The sole case cited in support of Dawn's position as to this issue, *Harner v. Harner* (1982), 105 Ill. App. 3d 430, 434 N.E.2d 465, is not in point, for there the court addressed the problem of unilateral modification of child support obligations in the context of a parent's attempting to assert overpayments of child support as an offset to an amount due the other parent for the children's medical expenses.

(Because of our resolution of this issue, we need not consider Steve's alternative argument that the circuit court erred in calculating the amount of maintenance arrearages due as of October 21, 1983.)

■■■ Steve additionally alleges several errors in the circuit court's calculation of arrearages of owelty and child support, as well as maintenance accrued prior to December 23, 1982, due as of October 21, 1983. In its order of that date, the court accepted as the beginning point of its calculation of arrearages of maintenance accrued prior to December 23, 1982, and child support, the arrearage of $1,212.17 stated in the order of December 23, 1982. The court subtracted from this amount payments of arrearages which Steve made between January and March 1983, to arrive at a total child support and pre-December 23, 1982, maintenance arrearage of $60.17. The October 21, 1983, order was also premised on the assumption that no part of the total owelty awarded in a previous order—$1,977.50—had been paid as of that date, and the court included this figure in the total amount of ar-

rearages. The clear import of the petition filed December 9, 1982 (which resulted in the December 23, 1982, order), was to effect a determination of maintenance and child-support arrearages which accrued from the beginning of this litigation through December 9, 1982. This conclusion is supported by the petition's reciting all of the court's preceding orders, including the initial order of February 11, 1981, which awarded Dawn $550 per month as temporary child support and maintenance. Moreover, the December 23, 1982, order simply states that the amount of $1,212.17 represents "arrearages"; it does not specify that the arrearages relate to any particular time period or type of obligation.

Assuming, *arguendo*, that Dawn's December 9, 1982, petition was not intended to bring about a determination of the amount of child support and maintenance arrearages accrued through that date, Steve's assertion that the amount of arrearages or overpayments for some periods prior to December 23, 1982, is still open to determination nevertheless comes too late. Nowhere in the record is there an indication that an arrearage of child support or maintenance payments had accrued during prior periods, and any overpayments of maintenance and child support made during such periods would thus have reduced the amount of arrearages due as of December 23, 1982.

Dissolution of marriage proceedings are no exception to the general rule that a judgment is *res judicata* as to matters which could have been presented and adjudicated in the proceedings which resulted in the judgment (*McLeod v. Sandy Island Corp.* (1975), 264 S.C. 463, 215 S.E.2d 903; 27B C.J.S. *Divorce* sec. 251(4)(c), at 69-70 (1959)). Steve's failure to raise the issue of possible prior overpayments in the proceedings relating to Dawn's December 9, 1982, petition therefore barred him from asserting the matter in subsequent proceedings. As for periods subsequent to December 23, 1982, a table supporting the court's October 21, 1983, order reveals no overpayments or arrearages accrued between December 23, 1982, and January 29, 1983, and Steve does not directly dispute the validity of the calculations contained therein.

■■ Steve also contends that all of the evidence, considered as a whole, indicates that some of the owelty which he was ordered to pay ($1,977.50) must have been paid prior to the October 21, 1983, order. Neither the clerk's records, the prior orders of the court, nor Steve's presentation show any of the owelty paid. If we consider only Steve's affidavit filed April 25, 1985, his argument fails. That affidavit shows child support and maintenance payments. It also shows owelty of $1,977.50 and no payment. The trial court did not err in including the

amount of owelty which was originally awarded to Dawn ($1,977.50) in its calculation of arrearages due as of October 21, 1983.

█ Steve's final contention is that the trial court erred in ordering him to execute a note and mortgage on the marital residence in order to secure the payment of attorney fees and arrearages in owelty, maintenance, and child support. As Steve correctly points out, the circuit court, in adjudicating the substantive rights of parties to dissolution of marriage proceedings, is limited to the exercise of authority specifically conferred by statute. (See *In re Marriage of Garrison* (1981), 99 Ill. App. 3d 717, 425 N.E.2d 518.) The former divorce act did provide courts with authority to order a party to a divorce action to furnish security for alimony and maintenance payments where the party wilfully refused to comply with court orders respecting payment of alimony and maintenance, or where the party had "shown himself unworthy of trust" (Ill. Rev. Stat. 1975, ch. 40, par. 19), but the IMDMA contains no similar provision.

█ Because the circuit court had no statutory authority to order the execution of a note and mortgage on the marital residence in this dissolution of marriage proceeding, we must reverse the portion of the trial court's order requiring Steve to execute those documents. We note, however, that in a proceeding on a citation to discover assets, an order of exactly the type here at issue may be entered (Ill. Rev. Stat. 1983, ch. 110, par. 2—1402(b)(5)) and that a judgment lien filed pursuant to section 12—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 12—101) has the same practical effect as this type of order. The two decisions which Dawn cites in support of her position as to this issue, *In re Marriage of Gentile* (1979), 69 Ill. App. 3d 297, 387 N.E.2d 979, and *Robin v. Robin* (1977), 45 Ill. App. 3d 365, 359 N.E.2d 809, are not in point, since they are premised on provisions of the Divorce Act as opposed to the IMDMA.

To recapitulate, we reverse the portions of the circuit court's order refusing to terminate Steve's maintenance obligation as of the date that he filed his petition for termination, ordering Steve to pay $750 of Dawn's attorney fees, and ordering Steve to execute a note and mortgage on the marital residence; affirm the remaining portions of the circuit court's order; and remand this cause to the circuit court for further proceedings consistent with the views herein expressed.

Affirmed in part, reversed in part, and remanded with directions.

GREEN, P.J., and TRAPP, J., concur.